UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KYLE ASH and MOSHE STEMPEL, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AXOS BANK, d/b/a UFB DIRECT,<br><br>Defendant. | Case No.: 24-cv-1157-RSH-BJC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO COMPEL ARBITRATION OR DISMISS**<br><br>[ECF No. 33] |

Before the Court is a motion to compel arbitration or to dismiss, filed by defendant Axos Bank d/b/a UFB Direct ("UFB"). ECF No. 33. Pursuant to Local Civil Rule 7.1(d)(1), the Court finds the motion presented appropriate for resolution without oral argument. For the reasons below, the Court grants in part and denies in part UFB's motion.

I.   **BACKGROUND**

The instant case is a putative class action brought by customers holding savings accounts with UFB. It is one of several related cases pending in this District. *See In re*

*Axos Bank Litigation*, 3:23-cv-2266-RSH-SBC,[1] *Pliszka v. Axos Bank,* 3:24-cv-00445-RSH-SBC.

The Complaint alleges Plaintiffs and other UFB customers were induced into opening savings accounts that UFB advertised were their "highest yielding" accounts with "variable" interest rates. ECF No. 1 ¶ 4. UFB then carried out a "bait and switch"—creating new savings accounts offering higher interest rates to new customers, without informing its existing accountholders. *Id.* ¶¶ 4–5. Rather than increasing the Annual Percentage Yields ("APYs") earned on its earlier accounts, UFB reclassified them as "legacy accounts" and froze their APYs. ¶ 7.

Named Plaintiffs Kyle Ash and Moshe Stempel are residents of California and New York, respectively, who were affected by UFB's alleged misconduct. *Id.* ¶¶ 13–14, 44–54. Plaintiffs seek to represent a class comprising: "[a]ll persons who have ever maintained a UFB high-yield savings account," or in the alternative, two classes consisting of "[a]ll persons in California who have ever maintained a UFB high-yield savings account" and "[a]ll persons in New York who have ever maintained a UFB high-yield savings account." *Id.* ¶ 55.

The Complaint brings claims for: (1) violation of California's Unfair Competition Law; (2) violation of California's False Advertising Law; (3) deceptive practices under New York General Business Law section 349(a); (4) false advertising under New York General Business Law section 350; (5) breach of contract, including breach of the implied covenant of good faith and fair dealing; and (6) unjust enrichment. *Id.* ¶¶ 66–121.

## II. LEGAL STANDARD

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, "governs arbitration agreements in 'contract[s] evidencing a transaction involving interstate commerce.'" *Fli-Lo Falcon, LLC v. Amazon.com, Inc.*, 97 F.4th 1190, 1193 (9th Cir. 2024) (quoting

---

[1] The *In re Axos* case is a consolidation of the *Sutaniman v. Axos Bank*, No. 3:23-cv-2266-RSH-SBC and *Blosser v. Axos Bank*, Case 3:24-cv-259-RSH-SBC cases.

9 U.S.C. § 2). Pursuant to Section 2 of the FAA, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This provision reflects "both a liberal federal policy favoring arbitration, and the fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal quotation marks and citations omitted).

The FAA permits "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration [to] petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. "In deciding whether to compel arbitration under the FAA, a court's inquiry is limited to two 'gateway' issues: '(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue.'" *Lim v. TForce Logistics, LLC*, 8 F.4th 992, 999 (9th Cir. 2021) (quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)). "If both conditions are met, 'the [FAA] requires the court to enforce the arbitration agreement in accordance with its terms.'" *Id.*; *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985) ("By its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.").

### III.   ANALYSIS

#### A.   Valid Agreement to Arbitrate

The Court first considers whether a valid agreement to arbitrate exists. *See Lim*, 8 F.4th at 999; *see Caremark, LLC v. Chickasaw Nation,* 43 F.4th 1021, 1030 (9th Cir. 2022) ("[A] court must resolve any challenge that an agreement to arbitrate was never formed[.]").

"Parties are not required to arbitrate their disagreements unless they have agreed to do so." *Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1092 (9th Cir. 2014). "In

determining the validity of an agreement to arbitrate, federal courts should apply ordinary state law principles that govern the formation of contracts," in this case, California law. *Ferguson v. Countrywide Credit Indus.*, 298 F.3d 778, 782 (9th Cir. 2002) (internal quotation marks omitted); *see* ECF No. 33-2 at 69, 78.[2] The party seeking to compel arbitration "has the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014).

Two agreements are relevant to this dispute: (1) the Personal Deposit Account Agreement and Schedule of Fees ("Personal Deposit Agreement"); and (2) the Online Access Agreement. ECF No. 33-1 at 17–21. The Parties do not dispute that the Online Access Agreement Plaintiffs originally entered into contains an arbitration provision, while the Personal Deposit Agreement does not. *Id.* at 17–19. Nevertheless, UFB contends both agreements were later updated to include arbitration provisions with class action waivers effective February 9, 2024. *Id.* at 19–21, 24. In response, Plaintiffs argues UFB has failed to prove that: (1) Plaintiffs agreed to the February 9, 2024 updates to the Personal Deposit and Online Access Agreements; or (2) Plaintiffs meaningfully assented to the original Online Access Agreement's arbitration provision. ECF No. 34 at 13–16, 19–20.

       1.    *Validity of Updates*

The Court starts by considering whether UFB's February 9, 2024 updates to the Personal Deposit and Online Access Agreements apply to Plaintiffs' claims.

Here, both the Personal Deposit and Online Access Agreements contain provisions stating that UFB could add, delete, or change the terms of these agreement "at any time." ECF No. 33-2 at 69, 77. Nevertheless, "a party with the unilateral right to modify a contract" does not have "carte blanche to make any kind of change whatsoever as long as

---

[2]    All citations to electronic case filing ("ECF") entries refer to the ECF-generated page numbers.

| | |
|---|---|
| 1 | a specified procedure is followed." *Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 791 (Ct. |
| 2 | App. 1998). Under California law, "[a] contract is unenforceable as illusory when one of |
| 3 | the parties has the unfettered or arbitrary right to modify or terminate the agreement or |
| 4 | assumes no obligations thereunder." *Harris v. TAP Worldwide, LLC*, 248 Cal. App. 4th |
| 5 | 373, 385 (Ct. App. 2016). Nonetheless, "[a] provision in an agreement permitting one |
| 6 | party to modify contract terms does not, standing alone, render a contract illusory |
| 7 | because the party with that authority may not change the agreement in such a manner as |
| 8 | to frustrate the purpose of the contract." *Serpa v. Cal. Sur. Investigations, Inc.*, 215 Cal. |
| 9 | App. 4th 695, 706 (2013). Instead, "the good faith and fair dealing implied covenant |
| 10 | limits unilateral action by a contracting party." *Harris*, 248 Cal. App. 4th at 389; *see* |
| 11 | *Cobb v. Ironwood Country Club*, 233 Cal. App. 4th 960, 965–66 (2015) ("[O]ne very |
| 12 | significant restriction on what might otherwise be a party's unfettered power to amend or |
| 13 | terminate the agreement governing the parties' relationship is the implied covenant of |
| 14 | good faith and fair dealing."). "The covenant operates as a *supplement* to the express |
| 15 | contractual covenants, to prevent a contracting party from engaging in conduct which |
| 16 | (while not technically transgressing the express covenants) frustrates the other party's |
| 17 | rights to the benefits of the contract." *Id.* at 966 (internal quotation marks omitted) |
| 18 | (emphasis in original). |
| 19 |       Plaintiffs argue UFB's updates to the Personal Deposit and Online Access |
| 20 | Agreements do not apply to Plaintiffs' claims because UFB was precluded from |
| 21 | unilaterally adding an arbitration provision that encompassed accrued or known claims. |
| 22 | ECF No. 34 at 14–16. The Court agrees that UFB was not entitled to unilaterally add |
| 23 | such a provision here. |
| 24 |       The California Court of Appeal's decision in *Peleg v. Neiman Marcus Grp., Inc.*, |
| 25 | 204 Cal. App. 4th 1425 (Ct. App. 2012), is instructive. In *Peleg*, the court invalidated an |
| 26 | arbitration agreement which gave an employer the unilateral right to "amend, modify, or |
| 27 | revoke" the agreement on "30 days' written notice," with the contract change applying at |
| 28 | the end of this 30-day period to "any claim" that had not been filed "with the American |

1  Arbitration Association (AAA)." *Id.* at 1432–33 (emphasis added). In so doing, *Peleg*
2  distinguished between unilateral modification provisions that were silent as to whether
3  contract changes applied to already-known or already-accrued claims and those that were
4  not. *Peleg* held a unilateral modification provision that was "silent as to whether contract
5  changes apply to claims, accrued or known" was nevertheless "impliedly restricted by the
6  covenant [of good faith and fair dealing] so that changes do not apply to such claims." *Id.*
7  at 1465. In contrast, "[a]n arbitration agreement that expressly *exempts* all claims,
8  accrued or known, from contract changes is valid and enforceable without resort to the
9  covenant." *Id.* Following *Peleg*, California courts have consistently reasoned that the
10 implied covenant of good faith and fair dealing "prevents [a party] from modifying
11 an arbitration agreement once a claim has accrued or become known to it." *Peng v. First
12 Republic Bank*, 219 Cal. App. 4th 1462, 1474 (Ct. App. 2013); *see also Cobb*, 233 Cal.
13 App. 4th at 966; *Avery v. Integrated Healthcare Holdings, Inc.*, 218 Cal. App. 4th 50, 61
14 (Ct. App. 2013).

15  Here, the Online Access Agreement's modification provision expressly provides
16 that "[e]xcept as otherwise required by law, any change to this Agreement applies only to
17 transactions that occur, or claims that arise, *after the change becomes effective*." ECF No.
18 33-2 at 69 (emphasis added). Although the Personal Deposit Agreement is silent on this
19 question, under *Peleg*, its modification provision is similarly restricted by the implied
20 covenant of good faith and fair dealing.

21  Plaintiffs' claims accrued in early 2023 when they opened savings accounts with
22 UFB. FAC ¶¶ 45, 50. UFB did not update the Online Access and Personal Deposit
23 Agreements until February 9, 2024, after Plaintiffs' claims had accrued and *after* the
24 *Sutaniman v. Axos Bank*, No. 3:23-cv-2266-RSH-SBC case—covering a similar subject
25 matter—had already been filed. As Plaintiffs' claims had already accrued, and were
26 known to UFB, its modifications to the Online Access and Personal Deposit Agreements'
27 arbitration provisions do not apply to those claims.
28 ///

  UFB raises two arguments against *Peleg*'s applicability. First, UFB contends *Peleg* is distinguishable because the instant suit was filed *after* the updates to the Personal Deposit and Online Access Agreements became effective—and not before. ECF No. 36 at 4. As Plaintiffs note, however, this argument was rejected by the California Court of Appeal in *Avery v. Integrated Healthcare Holdings, Inc.*, 218 Cal. App. 4th 50, 62 (Ct. App. 2013). In *Avery*, four months after the plaintiff filed a putative wage and hour class action, the defendant unilaterally modified an employee handbook to add a class action arbitration waiver. *Id.* at 61. A separate class action complaint was filed months later on the same subject matter and was thereafter consolidated with the first action. *Id.* at 58. As in this case, the defendant contended the covenant of good faith and fair dealing applied to exempt only the claims that had been filed prior to the modification (i.e., the claims in the first suit only). *Id.* at 61. The *Avery* Court rejected this argument, holding that "[t]he critical point in time is *when the claims accrued*, not when the employee files his or her judicial complaint." *Id.* at 62 (emphasis added). Similarly, here, the critical point in time is not when Plaintiffs filed their complaint—it is when Plaintiffs' claims accrued or became known to UFB.

  UFB next argues *Peleg* and its progeny are distinguishable because UFB provided its accountholders adequate notice of the changes to the Online Access and Personal Deposit Agreements and an opportunity to opt out. ECF No. 36 at 4–5. This argument is unpersuasive. UFB has not submitted any legal authority suggesting that a party may modify a contract to compel accountholders to arbitrate known or accrued claims simply by providing notice of this change and an opportunity to opt out.

  None of the legal authority UFB cites suggests notice and an opportunity to opt out are, by themselves, sufficient to allow a party to add a retroactive arbitration provision. *Trudeau v. Google LLC*, 349 F. Supp. 3d 869, 881 (N.D. Cal. 2018), cited by UFB, is distinguishable. In that case, the court found the defendant had not "unilaterally" modified a contract to add an arbitration provision when, after providing plaintiffs with ample notice, the defendant "*required them to accept or decline*" the updated terms "and

1  gave them a valid opportunity to opt out" of the arbitration provision. *Id.* at 881
2  (emphasis added). In contrast, here, there is no evidence UFB required Plaintiffs to
3  expressly accept the updates to the Personal Deposit and Online Access Agreements. And
4  "[a]s a general rule, 'silence or inaction does not constitute acceptance of an offer.'"
5  *Norcia v. Samsung Telcoms. Am., LLC*, 845 F.3d 1279, 1284 (9th Cir. 2017) (quoting
6  *Golden Eagle Ins. Co. v. Foremost Ins. Co.*, 20 Cal. App. 4th 1372, 1385 (Ct. App.
7  1993)); *see Cobb*, 233 Cal. App. 4th at 963 ("Plaintiffs certainly did not *agree* to any
8  such illegal impairment in this case.") (emphasis in original); *Stover-Davis v. Aetna Life*
9  *Ins. Co.*, No. 1:15-cv-1938-BAM, 2016 U.S. Dist. LEXIS 63693, at *15–16 (E.D. Cal.
10 May 12, 2016) (holding agreement with unilateral modification provision was not
11 illusory where defendant was *required* to obtain plaintiff's consent prior to alteration).

12     Moreover, the content of the notice given here was inadequate to require, by means
13 of a unilateral contract modification, arbitration of claims that had already accrued. In
14 *Franco v. Greystone Ridge Condo.*, 39 Cal. App. 5th 221, 232 (Ct. App. 2019), again
15 cited by UFB, the California Court of Appeal clarified that "in the context of unilateral
16 modification of an arbitration agreement, the implied covenant of good faith and fair
17 dealing requires an employer to provide reasonable and express notice to employees
18 *regarding the applicability of such modifications to already existing claims*." Here, UFB
19 submits evidence that it sent an e-mail with the subject line: "'Change in Terms for
20 Online Access Agreement and Deposit Account Agreement & Schedule of Fees' . . . to
21 all UFB accountholders [who] elected to have communications sent by e-mail."
22 Supplemental Declaration of Derek Tam ("Suppl. Tam Decl.," ECF No. 33-2 at 1–19) ¶
23 30. However, the e-mails are silent as to whether UFB's modifications would affect
24 already accrued or known claims. ECF No. 33-2 at 144–152. UFB does not explain how
25 those e-mails provided effective notice to accountholders as to the modification's effect
26 on such claims.

27     For these reasons, the Court concludes that Plaintiffs are not bound by the updated
28 February 9, 2024 arbitration provisions.

### 2. *Meaningful Assent*

Having determined that the Online Access Agreement's original arbitration provision is at issue, the Court turns next to whether there is sufficient evidence Plaintiffs meaningfully assented to this agreement. Plaintiffs argue UFB failed to provide them with "reasonably conspicuous notice" of the Online Access Agreement's terms, citing the California Court of Appeal's decision in *Herzog v. Superior Court*, 101 Cal. App. 5th 1280 (2024) in support. ECF No. 34 at 19–20.

In *Herzog*, defendant Dexcom moved to compel arbitration on the basis of a "clickwrap agreement" presented to the plaintiffs upon installing a mobile medical application on their personal smart devices. 101 Cal. App. 5th at 1285. Once plaintiffs had successfully created or logged into their Dexcom accounts, they would advance to a screen titled "Legal" with the following interface:

> [T]he following paragraph of text is displayed: "You understand and agree that your use of this website or any DexCom Inc. mobile application or software platform for your DexCom continuous glucose monitor is subject to the Terms of Use, Privacy Policy and any other acknowledgements listed below. *By ticking the boxes below you understand that your personal information, including your sensitive health information, will be collected, used and shared consistently with the Privacy Policy and Terms of Use*. You further understand that personal information and sensitive personal information will be stored and processed by DexCom, Inc., and/or its affiliate, SweetSpot Diabetes Care, Inc. in the United States, which may have different data protection laws than the country in which you reside."
>
> Underneath this paragraph were two boxes: one next to the statement, "I agree to Terms of Use" and another next to, "I agree to Privacy Policy." The phrases "Terms of Use" and "Privacy Policy," which were written in green, were hyperlinks that, if clicked, would take the user to separate webpages. The user has to click on the boxes in order to place a check mark in them, which would then allow the user to click on the green "Submit" button that appeared below the boxes. The user, however, is not required to actually view the hyperlinked

> Terms of Use (or the Privacy Policy) in order to complete the setup wizard process to use the G6 App.

*Id.* at 1289–90 (emphasis in original). The *Herzog* Court held users "would have no reason to believe, given the context of the transaction and the content of the text on the 'Legal' screen, that by clicking the checkbox next to 'I agree to Terms of Use' they were entering an agreement that concerned any matters other than the scope of the user's privacy waiver and management of the user's personal information." *Id.* at 1298.

The interface at issue in *Herzog*, however, differs from the one at issue here. In *Herzog*, the Terms of Use containing the arbitration provision were in a separate, hyperlinked page. *Id.* at 1290. In the context of such a "clickwrap" agreement, the *Herzog* Court reasoned that "the content of the screen on which a clickwrap is presented can undermine the inference the consumer had notice of the terms to which they were assenting when they clicked the associated checkbox." *Id.* at 1296–97. In contrast, UFB's Online Access Agreement is more similar to a "scrollwrap" agreement. "Scrollwrap agreements go one step further [than clickwrap agreements] and place the contractual terms directly in front of the user, requiring them to scroll through the terms before checking a box or clicking a button to indicate their assent[.]" *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 470 (Ct. App. 2021).

According to Mr. Tam, Plaintiffs were presented with a scrollable copy of the Online Access Agreement in its entirety and cautioned that by clicking the "Agree & Continue" button, they consented "to adhere to the Terms and Conditions as stated in the Axos Online Access Agreement." Suppl. Tam. Decl. ¶¶ 20–21. More specifically, to access their account online, an accountholder was required to return to UFB's website (or mobile application) and log in using their unique username and password. *Id.* ¶ 20.

///
///
///
///

1    When logging in for the first time, the accountholder was presented with a "Terms
2    & Conditions" screen:

[screenshot of UFB Direct Terms & Conditions screen showing Online Access Agreement, Version Effective February 9, 2024, with an orange "Agree & Continue" button]

17   *Id.* ¶ 20. The "Terms & Conditions" screen stated at the top: "Please read and accept our
18   Terms & Conditions." *Id.* ¶ 21. Directly below was "a copy of the Online Access
19   Agreement that individuals can scroll through to review." *Id.* Below this was text stating
20   the following:

> By selecting 'Agree & Continue', you consent to adhere to the Terms
> and Conditions as stated in the Axos Online Access Agreement. This
> Online Access Agreement governs your use of this site for your
> personal requests and transactions; and details the online policies
> relative to Axos Bank, Nationwide, and UFB Direct Online and Axos
> Invest accounts, products, services and features. Please read this
> Agreement carefully.

26   *Id.* The text was followed by an orange button reading "Agree & Continue." *Id.* ¶ 22.
27       The Court determines this agreement was sufficient to place Plaintiffs on notice of
28   the Online Access Agreement's terms. *Sellers*, 73 Cal. App. 5th at 470 ("[T]here should

be little doubt scrollwrap agreements are enforceable under California law *because the consumer is given the contract*, a sufficient circumstance to place the consumer on inquiry notice of the contractual terms.") (emphasis added); *see Flores v. Coinbase, Inc.*, No. CV 22-8274-MWF (KS), 2023 U.S. Dist. LEXIS 90926, at *8–9 (C.D. Cal. Apr. 6, 2023) (holding plaintiff "affirmatively manifested" assent where full text of agreement was made available in a "scroll-box"); *Veribi, Ltd. Liab. Co. v. Compass Mining, Inc.*, No. 2:22-cv-04537-MEMF-JPR, 2023 U.S. Dist. LEXIS 12333, at *25 (C.D. Cal. Jan. 20, 2023) (holding scrollwrap agreement provided "sufficient notice" of arbitration terms because the terms were presented "directly" to plaintiff); *Perez v. Bath & Body Works, LLC*, No. 21-cv-05606-BLF, 2022 U.S. Dist. LEXIS 116039, at *10 (N.D. Cal. June 30, 2022) ("[S]crollwrap agreements are enforceable, as they affirmatively show the terms to the user before obtaining assent rather than linking to a separate page containing the terms that does not need to be viewed prior to agreement (as clickwrap agreements do.").[3]

### B. Scope and Enforceability

The Court next turns to whether the Online Access Agreement's original arbitration provision covers Plaintiffs' claims, and if so, whether it is enforceable.

Plaintiffs argue the Online Access Agreement does not govern the claims in this case, and regardless, is unenforceable because it includes a waiver of public injunctive

---

[3] The other cases Plaintiff cite are also distinguishable. *Doe v. Massage Envy Franchising, LLC*, 87 Cal. App. 5th 23 (2022), involved a clickwrap agreement, not a scrollwrap agreement.
   Plaintiffs also cite the Seventh Circuit's decision in *Sgouros v. TransUnion Corp.*, 817 F.3d 1029 (7th Cir. 2016), a case applying Illinois contract law. *Sgorous* does not support Plaintiffs' position. Although the *Sgorous* decision involved a scrollwrap agreement, the Seventh Circuit found the interface in which the agreement was presented was "actively misleading" because the "block of bold text below the scroll box told the user that clicking on the box constituted his authorization for [defendant] to obtain his personal information. It says nothing about contractual terms." *Id.* at 1035. In contrast, here, UFB's interface specifically cautioned users that by clicking the "Agree & Continue" button, they consented "to adhere to the Terms and Conditions as stated in the Axos Online Access Agreement." Suppl. Tam. Decl. ¶¶ 20–21.

relief and a "poison pill" clause. ECF No. 34 at 16–21. UFB responds, in part, that the original Online Access Agreement's arbitration provision contains a clause delegating these questions to the arbitrator. ECF No. 36 at 5–7.

The FAA "allows parties to agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions[.]" *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019). However, "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so[.]" *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (quoting *AT&T Techs. v. Communs. Workers of Am.*, 475 U.S. 643, 649 (1986)). "Such 'clear and unmistakable evidence of [an] agreement to arbitrate arbitrability might include a course of conduct demonstrating assent or an express agreement to do so'—*i.e.*, a delegation clause." *Lim*, 8 F.4th at 1000 (quoting *Momot v. Mastro*, 652 F.3d 982, 988 (9th Cir. 2011)).

Here, the Online Access Agreement contains a delegation clause that states:

> You and we agree that any Covered Disputes between or among you and us, regardless of when it arose, will, upon demand by either you or us, be resolved by the arbitration process described in the Binding Arbitration and Waiver of Class Action Rights section below. You understand and agree that you and we are each waiving the right to a jury trial or a trial before a judge in a public court.

ECF No. 33-2 at 63. The provision also defines a "dispute" to include "[w]hether a disagreement is a 'dispute' subject to binding arbitration as provided for in this Arbitration Provision." *Id.* Finally, the provision provides that the Parties agree "[t]he Arbitrator will decide any dispute regarding the enforceability of this Arbitration Provision." *Id.* at 64.

In light of this delegation provision, Plaintiffs argue the Supreme Court's recent decision in *Coinbase* "mandates" that the Court—and not an arbitrator—decide "which contract governs the [P]arties' dispute[.]" ECF No. 34 at 13. The Court does not read *Coinbase* so broadly. In *Coinbase,* the parties executed two contracts: the first containing

an arbitration provision with a delegation clause, and the second containing a forum selection clause providing that all disputes related to that contract be decided in California courts. *Coinbase, Inc. v. Suski*, 144 S. Ct. 1186, 1190–91 (2024). Defendant argued the first contract's delegation clause "established the terms by which all subsequent disputes were to be resolved[.]" *Id.* at 1191. Plaintiffs maintained—and the Ninth Circuit held—that "the second contract's forum selection clause superseded that prior agreement." *Id.* The Supreme Court "granted certiorari to answer the question of who—a judge or an arbitrator—should decide whether a subsequent contract supersedes an earlier arbitration agreement that contains a delegation clause." *Id.* at 1192. In answering this question, the *Coinbase* Court held "a court, not an arbitrator, must decide whether the parties' first agreement was superseded by their second." *Id.* at 1195.

The *Coinbase* decision is a narrow one. It holds only that where "parties have agreed to *two* contracts—one sending arbitrability disputes to arbitration, and the other either explicitly or implicitly sending arbitrability disputes to the courts—a court must decide which contract governs." *Id.* at 1194. However, the instant case is not one where the Parties entered into two agreements with conflicting forum selection clauses. Instead, it is undisputed the Account Agreement did not have a forum selection or arbitration provision. The Court is, therefore, not being asked to choose between two conflicting agreements.

Further, even if the Court were being asked to choose between the Account Agreement's lack of a delegation clause and the Online Access Agreement's inclusion of one, the Supreme Court's *Coinbase* decision did not disturb the Ninth Circuit's reasoning below. *Id.* at 1194 ("We decline to consider auxiliary questions about whether the Ninth Circuit properly applied state law."). In its decision below, the Ninth Circuit applied the "general rule" that "when parties enter into a second contract dealing with the same subject matter as their first contract without stating whether the second contract operates to discharge or substitute for the first contract, the two contracts must be interpreted together and the *latter contract prevails* to the extent they are inconsistent." *Suski v.*

*Coinbase, Inc.*, 55 F.4th 1227, 1230 (9th Cir. 2022). Even if the Account Agreement and Online Access Agreement conflicted as to arbitrability, the Online Access Agreement is the *latter* contract in this case. According to Mr. Tam, accountholders agree to the Account Agreement *during* the enrollment process. Suppl. Tam Decl. ¶ 16. Accountholders then *subsequently* agree to the Online Access Agreement when signing up for online banking. *Id.* ¶¶ 20–23. Plaintiffs have not explained why the Ninth Circuit's reasoning would not apply so that the subsequent Online Access Agreement's delegation provision would prevail.

For the above reasons, the Court determines the Online Access Agreement's delegation provision governs and that threshold issues of arbitrability—including whether Plaintiffs' claims are properly within the scope of the Online Access Agreement—are properly reserved for the arbitrator. *See Henry Schein,* 586 U.S. at 68 ("When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue.").

## IV. CONCLUSION

For the above reasons, the Court grants in part and denies in part UFB's motion as follows:

1. The Court **GRANTS** UFB's motion to compel arbitration. The Court **ORDERS** the Parties to proceed to arbitration for a determination of arbitrability and possible arbitration of Plaintiffs' individual claims, in the manner provided for in the original Online Access Agreement.

2. The case is **STAYED** pending the completion of arbitration proceedings pursuant to 9 U.S.C. § 3.

3. The Parties are **ORDERED** to file a status update on their arbitration proceedings every **ninety days** and within **seven days** of completion of the proceedings.

///

///

4. The Court **DENIES** UFB's motion to dismiss as moot.

**IT IS SO ORDERED.**

Dated: September 13, 2024

*Robert S. Huie*
_____
Hon. Robert S. Huie
United States District Judge